IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| MELISSA MORLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-4315-CV-C-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Melissa Morley seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity and in failing to conduct a proper credibility analysis. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On September 30, 2008, plaintiff applied for disability benefits alleging that she had been disabled since December 16, 2006. Plaintiff's disability stems from seizures and back problems. Plaintiff's application was denied initially on January 22, 2009; and on February 25, 2011, a hearing was held before an Administrative Law Judge. On March 14, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 22, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

3

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Margaret Kelsey, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1995 to 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1995 | $ 4,137.25 | 2003 | $ 18,334.74 |
| 1996 | 5,471.50 | 2004 | 8,999.03 |
| 1997 | 9,026.01 | 2005 | 5,877.44 |
| 1998 | 5,442.51 | 2006 | 13,992.05 |
| 1999 | 2,630.57 | 2007 | 0.00 |
| 2000 | 9,089.06 | 2008 | 0.00 |
| 2001 | 16,224.15 | 2009 | 0.00 |
| 2002 | 19,853.63 | | |

(Tr. at 105, 107-108).

### Function Report - Adult

In a Function Report dated October 25, 2008, plaintiff indicated she lives in a house with her family (Tr. at 152-159). She described her daily activities: "I feed my cats. Make coffee and bring a cup to my husband. Shower, get dressed and brush my hair. Next I check my e-mail and look a my daily list. I do the chores on the list for that day. Make lunch. I'll try to write or read in the afternoon. I watch some TV in the evenings. Talk with my husband. Feed my cats dinner. And go to bed. On bad days I wake up and spend the day sitting in my chair."

4

Plaintiff indicated that on "seizure days" she cannot dress herself, some days taking a shower tires her out, washing her hair after a seizure is painful, she is unable to shave her legs during a seizure day, she cannot eat during a seizure, and "during a seizure I need help getting to and from the toilet". On some days plaintiff needs reminders that it is OK to rest if she needs to.

Plaintiff prepares her own meals, from sandwiches to larger meals. She spends 30 minutes to two hours preparing a meal. Plaintiff is able to clean, do laundry, and wash dishes. She does one chore per day and it takes her about three hours with breaks. Plaintiff is able to shop for groceries, clothing, household needs, books, music, movies. She shops at least once a week for "a few hours." Plaintiff's hobbies include reading, writing, watching television, playing her guitar, making candles, and painting. She does these things as often as she can, but some days she cannot concentrate enough to finish what she starts. She spends time with others on a daily basis. She visits her family weekly to help cook.

Plaintiff's condition affects her ability to lift, stand, walk, talk, climb stairs, complete tasks, concentrate, understand, follow directions, use her hands, and remember. It does not affect her ability to squat, bend, reach, sit, kneel, hearing, see, or get along with others. She can walk about a half a mile before needing to rest for five or ten minutes. On a bad day, she can only pay attention for about ten minutes.

Plaintiff stated that she needs a routine to keep her seizures "in as much control as [she] can."

**Missouri Supplemental Questionnaire**

On October 25, 2008, plaintiff completed a Missouri Supplemental Questionnaire in which she stated that she has not received any treatment since she filed her claim, but that she

5

had an appointment scheduled with Dr. Batchu on November 15, 2008, for her seizures (Tr. at 160-162). She reported that she uses her computer for about 30 minutes at a sitting.

**Function Report Adult - Third Party**

In a Third Party Function Report completed on October 25, 2008, plaintiff's husband stated that he had known plaintiff for 2 1/2 years, he operates a business out of their home and plaintiff runs the house and helps out when she can (Tr. at 163-171). On good days, plaintiff cooks, cleans, and helps with the administration of her husband's business. On a bad day, she sits in her chair having seizures. When she is experiencing a bout of seizures, she is unable to function much beyond "yes" or "no" answers to questions. Plaintiff goes shopping at least once a week for a "couple of hours." Plaintiff reads almost daily and is in the process of writing a book. Plaintiff visits her grandmother weekly and helps with the cooking.

According to her husband, plaintiff's condition does not affect her ability to sit, nor does it affect her memory. She can pay attention for two minutes to two hours, depending on the day. She is able to finish what she starts, she can following written instructions "well", she can follow spoken instructions "quite well" unless it is close to a seizure, and changes in routine adversely affect her condition.

**B.      SUMMARY OF MEDICAL RECORDS**

Plaintiff's alleged onset date is December 16, 2006.

On January 10, 2007, plaintiff was seen at Evanston Northwestern Hospital complaining of seizures (Tr. at 199-252). The triage nurse noted that plaintiff was making "jerking motions" with both upper extremities and her trunk, but she was able to continue answering questions without difficulty. Plaintiff was alert and oriented times three.[1]  Another

---

[1]Mentally alert and oriented to person, place and time.

registered nurse observed that plaintiff walked to her room with a steady gait. Yet another nurse noted that when she was inserting the IV into plaintiff's hand, plaintiff was able to hold her hand still even though all of her other limbs were jerking. Plaintiff continued to be alert and oriented times three "the whole time" and was able to answer questions during her "episodes" with no loss of bladder or bowel control. She was again observed walking to the bathroom without assistance, and she had a steady gait with no dizziness.

Plaintiff said she last worked as an assistant manager in a photo studio and was fired the end of November 2006 but did not know why (Tr. at 204). Plaintiff was well groomed, alert and oriented times three, and her physical presentation was unremarkable "except for some type of necklace that resembled a pet collar and chain." Plaintiff was observed to have no depression, no anxiety, no euphoria, no mania, and some mild hostility.

While she was there, plaintiff was evaluated by a social worker, Steven Cole, who wrote the following:

> Melissa McNamar [plaintiff's name before her most recent marriage] is a 26 YO divorced female who presents with symptoms of a seizure disorder. Symptoms have been present for a few weeks which necessitated a medical hospitalization on 12/13/06.[2] Today she presents again in the ED [emergency department] with complaint of seizures beginning in the AM on 1/10 and continuing with increased frequency until she came to ED [emergency department]. Precipitants include unknown etiology. Patient reports that she has been under stress due to loss of job in November and a custody battle regarding her daughter but states that the custody situation is resolved and that in some ways she is feeling less stressed than she has for a while.

(Tr. at 228-229). Her "current hospital medications" included only NaCl 0.9% intravenous, which means normal saline used for fluid and electrolyte replenishment (Tr. at 229). She was found to have "no evidence of Axis 1 psychiatric symptoms" (Tr. at 232).

---

[2]There are no records in the administrative transcript of a hospital visit from December 2016.

Her discharge record includes the following:

Pt is a 26 yo female with a h/o [history of] migraines and a brain lesion dx [diagnosed] on MRI that was unchanged as of 3 weeks[3] ago who presents with convulsions throughout the day. Pt states that convulsions began at 10:30 AM lasting about 15-20 seconds each, and occurring every 45-60 minutes. Pt dealt with them through the whole day, but finally decided to come in tonight after the seizures increased in frequency to every 1 minute or so. The duration of the convulsions decreased to about 5 secs each with no change in intensity. Pt states that right before she convulses, she feels her skin tingling. Throughout the convulsion, she is unable to speak and states that her surroundings become very fuzzy. Pt reports some disorientation afterwards, requiring a moment to get situated again. She reports no LOC [loss of continence] no loss of bowels, no tongue biting. Pt was in the hospital 3 weeks ago for a work up of this problem. Pt was reviewed by neuro and received an MRI and EEG which were unrevealing.[4] Pt was d/c'ed [discharged] and was OK for about 1 week. The convulsion[s] began again the following week, but only occurred occasionally until today. It was recommended that patient follow up with her neurologist and a psychiatrist however she did not follow through with either.

. . . Patient admits to some occasional alcohol use and to having smoked marijuana as a teenager. . . .

Occupational History: Last worked as an assistant manager in a photo studio. Was fired at the end of 11/06. States she doesn't know why. . . . Patient stated that when she last presented in December she was in the middle of a difficult custody situation regarding her daughter but this is now resolved as the daughter has gone to live with her ex husband. . . . Given the above the case was discussed with the ED [emergency department] attending and the psychiatry attending. All were in concert that client did not warrant admission and she was discharged with the same instructions as she was [in December]. . . "Follow up immediately with your neurologist Dr. Rubin [whose phone number was provided]."

---

[3]No records of this hospital visit appear in the administrative transcript. The records from this hospital visit include a "problem list" (Tr. at 226) which includes "psychosomatic seizure, pseudoseizure" with a date of 12/14/2006; however, it is unclear whether plaintiff reported this diagnosis or whether medical records reflecting this were available to these treating doctors in January 2007. Psychosomatic or pseudoseizures, also called psychogenic nonepileptic seizures ("PNES"), are paroxysmal episodes that resemble and are often mis-diagnosed as epileptic seizures; however, PNES are psychological (i.e., emotional, stress-related) in origin.

[4]Again, these test records are not a part of the administrative transcript.

Case 2:11-cv-04315-REL   Document 16   Filed 10/29/12   Page 8 of 33

Plaintiff's assessment was "R/O [rule out] Somatoform Disorder[5]," seizure disorder, history of migraines, problems with primary support group, occupational problems, and relationship difficulties, and she was assigned a GAF of 60.[6]

Thirteen months later, on February 4, 2008, plaintiff was seen at Pottsville Hospital in Pottsville, Pennsylvania, because she experienced two grand mal seizures that night (Tr. at 254-264). She had no oral injury and no incontinence but she reported numbness in her right hand and leg, limited movement in her right arm and no ability to move her right leg. She was observed to have no facial droop and no slurred speech. Plaintiff reported having taken Topomax in the past for migraine headaches but no medication for seizures. The only thing she had taken before coming to the hospital was Advil. She said she thought she had seizures when her blood sugar was low. Multiple CTs of plaintiff's head were normal (Tr. at 259, 263). Her blood work was normal (Tr. at 261-262). Plaintiff was discharged with no limitations (Tr. at 258).

On March 13, 2008, plaintiff was seen at the Geisenger Medical Center in Danville, Pennsylvania, for a neurological consultation with Robert Felberg, M.D. (Tr. at 265-266).

> She states that these were stereotypical and have occurred at least 50 or 60 times if not more since they first started. They begin with her feeling a prodrome of a haziness or fogginess. She also gets a skin crawling sensation over both arms and both legs. She will then become pale and sort of tunes out.

---

[5]Somatoform disorders represent a group of disorders characterized by physical symptoms suggesting a medical disorder. However, somatoform disorders represent a psychiatric condition because the physical symptoms present in the disorder cannot be fully explained by a medical disorder, substance use, or another mental disorder. These somatoform disorder physical complaints challenge medical providers who must distinguish between a physical and psychiatric source for the patient's complaints.

[6]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

9

This is then followed by a right leg tremor and jumping that spreads to the left leg and then to the upper body. They last for about 15 seconds. She has no incontinence, no tongue biting. She can remember conversations that occur during it, but she is not conversant during the spells.

After these spells, she feels a little spacey afterwards but is otherwise normal. The spells tend to cluster in that she will have multiple spells in 1 day. They also seem to occur in and around her menstrual period. She usually has 2 or 3 per month, but she can go months without spells.

In the beginning of February, she had a difference in her event. She had her normal spells, but then following it she was unable to move the right arm and right leg for about 1 hour. She was seen at an outside emergency department, and a CT scan was performed without any changes.

She now comes to me.

ASSESSMENT: This is a 27-year-old woman who has a normal physical examination. She comes in with complaints of spells. It is unclear what these spells represent. The description of them going from one leg to the other and then the upper body seems a little peculiar. She also has no true loss of consciousness, which would be unusual for generalized seizures.

Dr. Felberg decided not to send plaintiff to the epilepsy specialist and instead decided to send her to another neurologist and have an EEG and an MRI done.

On March 17, 2008, plaintiff was seen at the Geisenger Medical Center in Danville, Pennsylvania, for an EEG (Tr. at 267). The result was normal, but the record includes the statement that a normal EEG does not rule out epilepsy. "If epilepsy is clinically suspected, a repeat tracing achieving a deeper level of sleep may be of further value in assessing this patient."

On April 4, 2008, plaintiff saw Mark Lentz, M.D. (Tr. at 268). "I met with and examined this patient with Dr. Obradovic. We discussed this case in detail. I reviewed the documentation. . . . Ms. Morley has a well localized low back pain, with associated spasm but no radiation. I agree with an initial trial of non-opioid analgesics and an antispasmodic. In addition, she may benefit from PT [physical therapy] especially with her frequent lifting as

10

required by her job." According to plaintiff's testimony and her earnings record, plaintiff had not worked for the past 16 months.

On that same day, plaintiff had an MRI of her brain (Tr. at 276-277). Findings indicated the possibility of myelination;[7] however, Oleg Bronov, M.D., who interpreted the MRI, indicated that other findings on the MRI were atypical for delayed myelination. Another cause could be migraines. "Otherwise, unremarkable MRI scan of the brain."

On April 6, 2008, plaintiff saw Gordiana Obradovic, M.D., for a follow up (Tr. at 268-270). Plaintiff reported one recent migraine but said she used Advil and that helped. "No new symptoms of her migraine." Other than back pain, plaintiff had no other complaints. Plaintiff was still smoking one pack of cigarettes per day. Plaintiff said she had no depression and no joint problems. She had no tenderness and no muscle spasm in her back. "Patient states that she did have pain with SLR [straight leg raising] at 45 degrees, not noted on exam." Plaintiff was alert and oriented times three, she was fluent speech, no focal motor/sensory deficits, her gait was normal, her reflexes were normal and symmetric. At the end of the visit, plaintiff requested medication for lower back pain, specifically Flexeril (a muscle relaxer) and Vicodin (a narcotic). Dr. Obradovic did not want to give plaintiff a narcotic for her back pain, which upset plaintiff. "Patient works as a photographer, usually lift[ing] up to 30-40 pounds, and has back pain with that. She exercises regularly, she does swimming. Pain medications help". Dr. Obradovic offered plaintiff extra-strength Tylenol, but plaintiff refused. Dr. Obradovic advised plaintiff to stop smoking and offered her a Nicotine patch. "She is not willing to try."

---

[7]Myelin is a whitish fatty substance that acts like an electrical insulator around certain nerves in the peripheral nervous system. It is thought that the loss of the myelin surrounding the vestibular nerves may influence the development of Ménière's disease.

11

On May 12, 2008, plaintiff had a pelvic ultrasound during which a left ovarian cyst was observed (Tr. at 253). No medications were prescribed.

On May 22, 2008, plaintiff was seen by Mark Stecker, M.D., a neurologist (Tr. at 271-272). In reviewing her history of seizures, he noted that she had never been given medication. Plaintiff denied psychiatric problems. She said that her current medications included Vicodin; however, the previous month Dr. Obradovic refused to prescribe Vicodin and there is no other record showing that another doctor prescribed that narcotic. Plaintiff was smoking a pack of cigarettes per day. She reported that she was "writing fiction." Dr. Stecker wrote:

> ASSESSMENT/PLAN:
> 1. Events -- I am not sure what they are. . . . After discussion let's do ambulatory EEG. Call after the test for discussion. . . . Please send a copy of this report to the patient's PCP [primary care physician]. I feel that the current neurologic medications can be appropriately renewed and refilled by the Primary Care Provider.

On June 12, 2008, plaintiff had a CT scan of her pelvis in connection with her ovarian cyst and abdominal pain after her tubal ligation (Tr. at 278-279).

On June 23, 2008, plaintiff had an EEG which was normal (Tr. at 273).

On July 24, 2008, plaintiff had laparascopic surgery to drain an ovarian cyst (Tr. at 274-275, 294-296). Her medications included Neurontin [treats seizures] and Flexeril [muscle relaxer]. Plaintiff was asked whether she was experiencing any pain, and she said, "no." She was asked whether she had a history of falls, and she said, "no." She was asked if any of her medications make her lightheaded or dizzy. She said, "no."

On October 21, 2008, plaintiff saw Michael Griswold, M.D., to establish care (Tr. at 317). Plaintiff said she has a history of seizures and needed a referral to a neurologist. Plaintiff's physical exam was normal. She was assessed with seizures, tobacco abuse, and migraines.

12

On November 15, 2008, plaintiff had a neurological consult with Sudhir Batchu, M.D.

(Tr. at 280-281, 301-302, 316).

History:  This is a 28-year-old left-handed Caucasian female with history of seizures starting in December 2006, seen for above reason.  The patient apparently started having seizure[s] on December 2006 with [a] cluster of seizures that occurred 30 in number in a matter of one and a half hour[s].  She was in Illinois at that time and was taken to the hospital in Evanston, Illinois.  Apparently the workup at that time was completely normal.  Since the past September she had one seizure per day for about 14 days.  She was started on Neurontin [treats seizures] that helped for a while, but still having breakthrough seizures.  In February 2008 she had an episode of paralysis on one side.  During the seizures she gets disoriented and then will have a body shake.  She does get muscle aches afterwards.  Each seizure lasted about 10-12 seconds.  She had repeat workup in Pennsylvania when she had ambulatory EEG that was also reported to be normal.  Recently she started having headaches.  She had a history of seizures prior to that and was diagnosed to have migraine at the rate of one per week.  MRI of the brain in Pennsylvania showed mild white matter disease particularly in the occipital area.  She was tried on Topamax [treats seizures] up to 200 mg per day that was stopped suddenly and was placed on Wellbutrin [treats depression] prior to the onset of the seizures in December 2006.  She had a full workup for multiple sclerosis including spinal tap that was completely negative.  She had a three day ambulatory EEG but no electroconvulsive seizures on the three day ambulatory EEG when she had a few spells.  She was noted to have some nail bed vascular problems by Dr. Griswold and was placed on enteric coated aspirin. Her rheumatoid factor was negative.

Past Medical and Surgical History:  Degenerative joint disease, headaches, seizures.

Medications:  Neurontin 800 mg twice a day and enteric coated aspirin one tablet once a day.

Social History:  The patient is apparently a writer. One year college education.  Smokes about a pack of cigarettes per day. Occasional alcohol abuse . Denies any drug abuse.  She is single with one 9-year-old daughter.  She has a live-in fiancé.

* * * * *

Physical Exam:
. . .  Mental status:  The patient is alert and oriented x3.  Mood is good. Affect is normal.  No speech or language dysfunction. . . .  Gait:  Normal.  Coordination:  Intact.

Impression:
1.      Seizures versus pseudoseizure.  Initial seizure in December 2006 probably related to Topamax withdrawal and Wellbutrin.
2.      Right hemihypesthesia[8] of uncertain etiology.

---

[8]Diminished sensitivity on one side of the body.

Case 2:11-cv-04315-REL   Document 16   Filed 10/29/12   Page 13 of 33

3.      Apparent white matter disease[9] in occipital area of the brain of uncertain etiology.

Plan:
1.      We need to repeat MRI of the brain and EEG and may consider sleep deprived EEG if needed.
2.      I reviewed her available records from Illinois and Pennsylvania and the available ambulatory EEG report.
3.      Continue Neurontin, but increase dose to minimum of 1800 mg per day.
4.      Repeat lab workup.
5.      Follow up after the above for further management.

On December 18, 2008, plaintiff saw Debra King, M.D., for head congestion and lower

back pain (Tr. at 314-315). She described her pain a 6 out of 10.  Plaintiff continued to smoke.

[S]he has also had some chronic & recurrent back pain.  Pt states that the back pain some days is worse than others; typically worse on the L side than R side.  It occasionally goes down the L leg to the knee. She had a CT scan or an MRI performed in early summer in Pennsylvania, of which she thought the results would have been here by now. She states that they said that she had some DDD [degenerative disc disease].  She has tried PT [physical therapy], which was not beneficial for her.[10]  She states she is not on any regular medication for it at this time, but feels like she needs something.  CURRENT MEDICATIONS: Noted in chart; her only medications for her seizure disorder including Neurontin, of which she is taking regularly w/o difficulties.

. . . Exam of her back today; Pt localizes her pain as being primarily over the central area of the lumbar spine in the L-3 to L-5 region.  She had minimal spasm of the paraspinous musculature.  No palpable, soft tissue masses. She did not have any reproducible tenderness to palpation over the SI-joints & had fairly normal ROM [range of motion] of the lower lumbar spine w/flexion, extension & lateral rotation. She had negative straight leg raises of the LE [lower extremities] & denied any leg pain today. Motor & sensory testing of the LEs today seemed grossly WNL [within normal limits].

Dr. King assessed history of persistent low back pain and bronchitis "in a Pt

w/underlying seizure disorder."

Discussed w/Pt today before making further recommendations we really would like to get a copy of her CT scan to review to see if the DJD/DDD [degenerative joint

---

[9]Diffuse ischemic white matter disease impairs executive functioning, information processing speed, and gait.

[10]There is no record of plaintiff having participated in physical therapy in this administrative transcript.

14

disease/degenerative disc disease] correlates w/any of her symptoms.  Pt will sign another release and will contact the hospital in Pennsylvania & once test results are known will get back to her.  In addition, today Pt was concerned about her weight gain, which she states is partially due to inactivity due to her back pain.  Again, will defer & get a copy of her blood work already done this year in terms of thyroid testing & blood sugar testing & will make recommendations once those results are known.

On January 28, 2009, plaintiff saw Debra King, M.D., to discuss an exercise plan to help with her back pain (Tr. at 312-313).  She continued to smoke.  She was taking Darvocet (a narcotic) daily "and that does seem to be working well for her."  Plaintiff had purchased an exercise ball and wanted to do some kind of gentle stretching with it.  "She states that she is still having pain occasionally in her low back or going down the legs, but not very far down.  She states she has been sleeping well & otherwise doing well.  She is not having any sedation w/the Neurontin, but has still not been able to lose any weight on it."  Plaintiff's exam was essentially normal.  She had some mild tenderness over her sacroiliac joints, no point tenderness over the lower lumbar spine.  She was assessed with "persistent low back pain; CT scan last summer showing some Schmorl's nodules,[11] but no other significant pathology."

Dr. King told plaintiff to do gentle stretching; and she gave samples of Skelaxin, a muscle relaxer.  She also provided samples of Darvocet, a narcotic.  "I do think that regular exercise & stretching will make the biggest difference and will await to see how patient responds."

On January 29, 2009, plaintiff saw Dr. Batchu (Tr. at 300).  The one-page record is almost entirely illegible.  It appears to say that plaintiff was still having side effects with Neurontin.  The record says "break through seizures" but I cannot tell whether plaintiff reported having them or not having them.  Plaintiff reported that her seizures involved full

---

[11]An irregular or hemispherical bone defect in the upper or lower margin of the body of a vertebra.

15

body shaking, difficulty understanding, no communication. Her physical exam was completely normal. Dr. Batchu assessed "Idiopathic seizures versus pseudo seizures" and he changed her dosage of Neurontin.

On March 10, 2009, plaintiff saw Dr. Batchu (Tr. at 299). She said Depakote was not working, was giving her mood swings and an upset stomach although her spells were better and with less frequency. Her physical exam was normal; she had normal extremity coordination and normal gait. She was assessed with "apparent seizure disorder." Dr. Batchu gave plaintiff a trial of a medication that is illegible.

On March 18, 2009, plaintiff saw Amber Backes, a nurse practitioner, complaining of low back pain (Tr. at 311). She rated her pain a 4 out of 10. Plaintiff reported tingling and numbness. She denied loss of memory, sleep problems, depression or any other psychiatric or mood problems. Her exam was normal. Nurse Backes assessed persistent bronchitis (plaintiff continued to smoke) and pelvic pain. Plaintiff declined a PAP smear, and although an ultrasound was recommended, she declined that, saying she had to pay for it herself. Plaintiff was given a prescription for Doxycycline, an antibiotic.

On April 7, 2009, plaintiff saw Debra King, M.D., to discuss pain therapy for her back (Tr. at 309-310). She said she had been tried on Neurontin and Darvocet but those have not made a significant difference. She has also used non-steroidal anti-inflammatories. She described her back pain a 6 1/2 out of 10.

> Pt states that she also has been having some intermittent seizures. Her neurologist now has tried her on Tranxene 3.75 mg t.i.d. [three times per day]. She states when she does have her seizures that they tend to cause her to arch her back in a fetal position & then that seems to aggravate her symptoms. She was wondering if there was anything that could be done about that.

On exam plaintiff had spasm over her paraspinous musculature, minimal tenderness over the sacroiliac joints, fairly normal range of motion of the lumbar spine and hips. She had

positive straight leg raising[12] on the right side.  She appeared to have some mild weakness of

the quadriceps and hamstrings and "slightly" diminished sensation to light touch over L4-5.

Plaintiff was assessed with a history of ongoing low back pain with radicular symptoms.  "Will

see if pt can qualify for charitable funds.  If so would like to schedule for an MRI of the lumbar

spine & flexion and extension x-rays.  Until then will try her on a Medrol Dose-Pak [a steroid

that prevents inflammation].  She will continue her Tranxene, as prescribed by her neurologist

for her seizure disorder.

On May 7, 2009, plaintiff had an MRI of her lumbar spine due to complaints of low

back and bilateral leg pain (Tr. at 308).  Patricia Macfarlane, M.D., observed minimal disk

bulge at T11-T12 with mild narrowing.  It was recommended that x-rays be taken of that area

to see if it affects her alignment.

On May 11, 2009, plaintiff had 5 x-rays of her lumbar spine (Tr. at 305).  Only mild

degenerative changes consistent with spondylosis[13] were noted.  She also had an x-ray of her

---

[12] During the straight leg raising test, the patient lies down on a table and the doctor will lift
the patient's straightened leg into the air.  If the patient feels pain that travels down his leg
when it is lifted to the 30° to 70° range, then the straight leg raise test is considered positive.
That pain should replicate what the patient would describe as his typical leg pain. The
radiating leg pain is called sciatica, among the most common and painful symptoms of a
lumbar herniated disc.  A straight leg raise test is used to help diagnose a lumbar herniated disc
because the simple act of raising one's leg stretches the spinal nerve root. If the patient has a
lumbar herniated disc, it should press on the stretched nerve root as his leg is raised above 30°.
If the doctor does a straight leg raise test and the patient has pain before his leg is at 30°, then
it probably is not a herniated disc pressing on the nerve. Before 30°, the nerve root is not
stretched, and it is the nerve root stretching in the straight leg raise test that brings the nerve
closer to the herniated disc (if there is one). Therefore, pain before 30° means that there is
something else besides a herniated disc pressing on the nerve.  In this case, Dr. King did not
indicate at what degree the test caused plaintiff's pain.

[13]Lumbar spondylosis describes bony overgrowths (osteophytes) of vertebral bodies. Lumbar
spondylosis usually produces no symptoms. When back or sciatic pains are symptoms, lumbar
spondylosis is usually an unrelated finding.  In fact, someone wrote on the medical record that
"X-rays of lower thoracic spine are normal." (Tr. at 306).

thoracic spine which showed only mild degenerative changes and no acute abnormalities (Tr. at 306). Additionally she had x-rays of her lumbar spine during flexion and extension, and those were normal (Tr. at 307).

C.    *SUMMARY OF TESTIMONY*

During the February 25, 2011, hearing, plaintiff testified; and Margaret Kelsey, a vocational expert, testified at the request of the ALJ.

1.    **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 30 years of age (Tr. at 30). She has a high school education and one year of college with a certified nursing certificate (Tr. at 30). She last worked in that capacity in 2004 (Tr. at 30).

Plaintiff is 5'1" tall and weighs 160 pounds (Tr. at 30). Plaintiff's alleged onset date is December 16, 2006, because on that date her seizures lasted for four or five hours before she realized what was going on (Tr. at 30). Her daughter, who was seven years old at the time, was very concerned about the seizures (Tr. at 30). Plaintiff has not worked since then (Tr. at 31).

Plaintiff cannot work full time because she cannot get her seizures under control (Tr. at 31, 38). She can have two or three episodes in a week and then go several weeks without one before they come back again (Tr. at 31). Her entire body shakes, she stays conscious, her perception of reality is altered, she does not always know exactly what time it is or where she is, and it is very difficulty to answer questions coherently (Tr. at 31). Plaintiff thought the beginning of her period triggered the seizures, but sometimes they come out of the blue (Tr. at 31). Plaintiff's seizures last about 40 seconds, but a full episode can last up to four or five hours (Tr. at 31-32). After a bad seizure, she will be paralyzed on the right side (Tr. at 32). Other times she is incredibly tired and she spends most of the time lying down resting (Tr. at

18

32).  During an average month, plaintiff can have 12 to 15 seizures (Tr. at 32).  The seizures come in clusters, and she can have about three "episodes" a month (Tr. at 32).

Plaintiff has been on several different medications all of which have worked for only a month or two (Tr. at 32-33).  When she has break-through seizures and her medication dose is increased, plaintiff has intolerable side effects and has to try a new medicine (Tr. at 33).  With one drug plaintiff could not sleep; with another she was so foggy she could not function during the day -- she could not think clearly, could not communicate, could barely remember how to tie her shoes (Tr. at 33).  Plaintiff is not taking any medication for her seizures -- she said her prescription ran out and she does not have the money to see her doctor to get a new prescription (Tr. at 33).  Plaintiff has not taken any medication for seizures in "just over a year" (Tr. at 37).  She estimated that she has had 24 to 30 "episodes" during the last year (Tr. at 37).

Plaintiff also suffers from migraine headaches (Tr. at 33). She has had them since she was 15 or 16 but was diagnosed in 2003 (Tr. at 33).  At the time of the hearing it had been a month and a half since her last migraine, but sometimes she has them about once a week (Tr. at 33).  Her migraines last three weeks (Tr. at 34).  The ALJ commented that this did not make any sense and asked plaintiff to explain (Tr. at 37).  "I have some migraines that will last for three weeks straight, and I have other episodes, other migraines that will last for about 72 hours, decrease in intensity and then increase." (Tr. at 37).  Although her medical records do not reflect complaints of migraine headaches, plaintiff said in the past she did report them (Tr. at 37).  She takes only Naproxen for her migraines (Tr. at 37).

Plaintiff suffers from a degenerative back condition that causes extensive pain in her lower back (Tr. at 34).  When she is sitting, the pain can range from annoying to excruciating; when she stands she can also have problems with the pain (Tr. at 34).  It causes her hips to

19

dislocate slightly so she has trouble walking (Tr. at 34). Plaintiff can only sit for about 45 minutes (Tr. at 34). Some days standing for 20 minutes to do the dishes causes her pain; when it is humid she can only walk for about 30 minutes (Tr. at 34). Plaintiff's back pain limits her lifting, and she has difficulty vacuuming because of the pushing and pulling involved (Tr. at 36). Plaintiff can lift about ten pounds (Tr. at 36).

On a "seizure day," plaintiff cannot do anything but lie around (Tr. at 35). Plaintiff lives in a mobile home with her husband (Tr. at 35). She has one daughter (age 11) who lives with plaintiff's ex-husband (Tr. at 35). Although plaintiff was ordered to pay child support, that order has been suspended due to her disability (Tr. at 35). Plaintiff married her current husband in January 2007 (Tr. at 35).

Plaintiff's driver's license was suspended due to her seizures (Tr. at 35-56). She has to go six months without a seizure before she is eligible to get her license back (Tr. at 36).

Since her alleged onset date, plaintiff has tended to get anxious if anything changes in her routine (Tr. at 36). "My history has proven that if my routine changes, I am almost guaranteed to have a seizure." (Tr. at 36). This causes increased anxiety, and she is also anxious about going out in public because she does not want to have a seizure in public (Tr. at 36).

No doctor has ever placed any restrictions on plaintiff's activities (Tr. at 36-37). She can use a computer (Tr. at 37). Plaintiff had not been to any doctor in the two years prior to the administrative hearing (Tr. at 37-38). Plaintiff's husband works as an asset protection officer for Wal-Mart (Tr. at 38). Plaintiff testified that although her husband works, they cannot afford to buy health insurance (Tr. at 38). Plaintiff has not gone to any emergency room or hospital clinics (Tr. at 38).

2.    **Vocational expert testimony.**

Vocational expert Margaret Kelsey testified at the request of the Administrative Law Judge.  The first hypothetical involved an individual who can lift 20 pounds occasionally and ten pounds frequently; stand or walk for six hours per day; sit for six hours per day; should never climb ladders, ropes, or scaffolds; and should avoid hazards such as unprotected machinery and heights (Tr. at 41). The vocational expert testified that such a person could be a lab assistant, phlebotomist, photographer or studio manager, all past relevant jobs held by plaintiff (Tr. at 41).

The second hypothetical was the same as the first except the person would miss two to three days of work per month due to various medical conditions (Tr. at 42).  The vocational expert testified the such a person could not work (Tr. at 42).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Eleanor Moser entered her opinion on March 14, 2011 (Tr. at 10-20).  She found that plaintiff met the insured status requirements through December 31, 2011 (Tr. at 12).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12).

Step two.  Plaintiff's severe impairments include seizures and back problems (Tr. at 12).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12).

Step four.  Plaintiff's subjective allegations of disabling symptoms are not credible (Tr. at 14-19). She retains the residual functional capacity to perform light work except she can lift 20 pounds occasionally and ten pounds frequently; stand and/or walk six hours per day; sit for two hours per day; may never use ladders, ropes, or scaffolds; and should avoid all exposure to hazards such as machinery and heights (Tr. at 13).  With this residual functional capacity,

21

plaintiff can perform all of her past relevant work which includes certified nurse aid, lab assistant, phlebotomist, medical assistant, photographer, manager studio photography, and truck loader (Tr. at 19).

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

22

1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the

Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or

other symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of

disability are as follows:

> Why would the claimant give a more accurate description of [her] symptoms to the
> undersigned than to [her] treating physicians?  The undersigned has nothing to offer to
> ameliorate these complaints; whereas the doctors may.  If anything the reverse should
> occur.  The more accurate description should appear in the medical records.

> When complaints are absent from the medical record or when the medical records do
> not reflect the same degree of severity or frequency, it is reasonable to assume one of
> two things. Either the claimant did not tell the doctors about these symptoms, their
> severity and their frequency, or the doctors deemed such complaints insignificant.
> Either conclusion undermines the credibility of the claimant's testimony. The claimant
> further testified she had spells on an irregular basis, and that stress, weather and issues
> with her family would cause her to have seizures. At this time the undersigned can find
> no new medical records since May 2009, and there are no new objective medical tests
> performed by physicians; so the claimant['s] allegations that she cannot work [are not]
> supported by the medical evidence of record.

> If the claimant's pain is not severe enough to motivate her to seek treatment (or to
> follow her doctor's advice), it becomes more difficult to accept her assertion that her
> pain is disabling and prevents her return to any and all work. The claimant stated she is
> taking Naproxen for pain, which is an over-the-counter medication.  Moreover, the
> claimant['s] exaggerated statements and lack of objective medical evidence of record
> causes the undersigned to question her credibility.

> The record does not contain any opinions from treating physicians that identify any
> subjective or objective medical findings to support a conclusion indicating that the
> claimant is disabled or even has limitations greater than those determined in this
> decision. Given the claimant's allegations of totally disabling symptoms, one might
> expect to see some indication in the treatment records of restrictions placed on the
> claimant by the treating doctor.  Yet a review of the record in this case reveals no
> restrictions recommended by a treating doctor. The claimant testified at the hearing her
> doctor has not placed any restrictions on her.  During the past years since May 2009,

23

there have been no new medical records scanned into the electronic files. The undersigned finds such a lack of new medical records further erodes her reliability as a fact witness. . . .

. . . . The undersigned has concluded the claimant has failed to show the seriousness of her claim[] by failing to provide more medical evidence from any source which the claimant has visited. Such a failure would then lead the undersigned to see the claimant's credibility [is] eroded significantly.

(Tr. at 17-18).

Plaintiff argues that the ALJ discredited plaintiff's testimony after misinterpreting the medical records and being "short and vague" in her analysis. Plaintiff also argues that "Contrary to the ALJ's statement, Ms. Morley's statements to her doctors seem consistent with what was in her testimony." This is hardly how I read the record.

## 1. PRIOR WORK RECORD

The medical records establish that plaintiff reported that she was fired from her last job in November 2006. This is before her alleged onset date and also establishes that plaintiff stopped working due to being fired, not because of any physical or mental impairment. Additionally, plaintiff's husband said plaintiff was helping him with the administration of his business which was run out of their home. He also said plaintiff was writing a book. Over the years plaintiff reported to her doctors that she was working -- in April 2008 she said she was working as a photographer and even indicated how many pounds she lifted at her job. This suggests that plaintiff either (1) lied to her doctors in order to get the kind of treatment or medication she desired, or (2) she was working and not reporting her earnings. Either conclusion supports the ALJ's finding that plaintiff' testimony is not credible. In May 2008 she told her doctor that she was writing fiction, in October 2008 she told her doctor that she is a writer.

The reason for plaintiff leaving the workforce is unrelated to her impairments. Her description of her employment over the years to her doctors belies her allegation that she cannot work. The first Polaski factor supports the ALJ's finding.

2.     DAILY ACTIVITIES

According to the record, plaintiff prepares meals for 30 minutes to two hours, she cleans, she does laundry, she washes dishes, she shops for a few hours at a time every week, she reads, she writes, she watches television, she plays the guitar, she makes candles, she paints, she goes shooting, she helps her grandmother cook once a week, she uses her computer for 30 minutes at a time, and she helps with the administration of her husband's business. In April 2008 she told her doctor she was working as a photographer, exercising regularly, and swimming. These daily activities do not support plaintiff's tesetimony.

3.     DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that she cannot get her seizures under control; however, she had not been on any medication for more than a year. Plaintiff testified that during a seizure she does not always know exactly what time it is or where she is, yet every time she was at a hospital supposedly having a seizure, she was observed to be alert and oriented to person, time and place. Plaintiff testified that it is very difficult for her to answer questions coherently during a seizure and she told Dr. Felberg that she is not conversant during a seizure; however, every medical professional who questioned plaintiff during a seizure observed that she had no difficulty answering questions while her limbs and trunk were shaking. Plaintiff testified she can be paralyzed on her right side after a seizure; however, this was not reported to any doctors and no medical professional ever observed paralysis after plaintiff had one of her episodes in their presence.

25

Plaintiff testified that during a seizure she needs help going to and from the toilet; however, when plaintiff was at the hospital supposedly having a seizure, nurses observed that while sitting, her legs were shaking, but she was able to walk unassisted to her room and to the bathroom with a steady gait. When a nurse put an IV in plaintiff's hand, her hand stopped shaking but her other limbs continued to shake. This strongly suggests that plaintiff was either faking the seizure or greatly exaggerating the "shaking" part of her seizure.

Plaintiff went well over a year without seeing any doctor -- nearly the entire year of 2007 and the beginning of 2008 -- suggesting that the duration, frequency and intensity of her condition was not disabling. By May 22, 2008 -- a year and a half after plaintiff's alleged onset date -- Dr. Stecker noted that plaintiff had never been on any medication for seizures, suggesting that the duration, frequency and intensity of her symptoms was not that bad.

In May 2008 she denied any psychiatric problems. In July 2008 she said she was not experiencing any pain. In March 2008, plaintiff denied sleep problems, loss of memory, depression, or any other psychiatric or mood problems.

This factor supports the ALJ's credibility finding.

## 4.    *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff claimed that low blood sugar, her menstrual period, or a change in routine cause her seizures. There is no evidence of any of this.

## 5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

As mentioned above, plaintiff went a year and a half after her alleged onset date without being prescribed any medication at all for seizures.

In April 2006, plaintiff told Dr. Obradovic that she had had one recent migraine and took Advil for that which helped. She had no new migraine symptoms, and she had no pain complaints other than her back. She specifically denied joint pain and depression. Plaintiff

26

told Dr. Obradovic that she had had a positive straight leg raising test; however, Dr. Obradovic noted that it was not positive on her exam. In fact, her exam was normal with no back tenderness or muscle spasm. Plaintiff specifically requested a narcotic, refused extra-strength Tylenol, and got upset with the doctor when she was told she would not get a narcotic prescription. Dr. Obradovic did not believe that plaintiff's pain required a narcotic.

In July 2008 plaintiff said that none of her medication caused dizziness or lightheadedness. In December 2008 she told Dr. King that she was taking Neurontin without any difficulties. Five weeks later, on January 28, 2009, she told Dr. King she was sleeping well and was doing well other than occasional back pain, indicating her medication was working well. Curiously, the very next day, on January 29, 2009, she told Dr. Batchu that Neurontin was giving her "side effects," although none were specified; and she also told him that she was having break-through seizures, which contradicts what she told Dr. King the day before. Despite the "side effects," Dr. Batchu kept her on Neurontin.

This factor supports the ALJ's finding.

## 6. *FUNCTIONAL RESTRICTIONS*

It is undisputed that no doctor has ever put plaintiff on any restrictions. The record does not reflect that plaintiff has any functional restrictions.

Plaintiff claimed in her Functional Report that on a bad day she can only pay attention for ten minutes. However, she reads every day, she is writing a book, she works on her computer for 30 minutes at a time, she can shop for several hours at a time, she cooks for 30 minutes to two hours at a time, she helps her grandmother with cooking, according to her husband she is able to start what she finishes and follows instructions well, her husband said her condition does not affect her memory. Well over a year after her alleged onset date, she was released from the emergency department with no limitations. More than two years after

27

her alleged onset date, Dr. King said that regular exercise and stretching would make the biggest difference in her condition.

As the ALJ noted, plaintiff's physical and mental exams were consistently normal. After her first visit to the hospital reporting seizures (when multiple medical professionals observed that plaintiff could easily answer questions, walk without difficulty, and hold her hand still for an IV insertion while her limbs and body were shaking), plaintiff was discharged with no medication, no restrictions, and a belief that her symptoms were psychological. Thirteen months later, her exam in a Pennsylvania hospital was completely normal. In October 2008, her physical exam was normal and a mental status exam was normal. In March 2008, plaintiff denied sleep problems, loss of memory, depression or any other psychiatric or mood problems. Plaintiff's husband stated that plaintiff's condition does not affect her ability to sit. There simply is nothing in the record to support plaintiff's allegation of disabling functional limitations.

**B.    *CREDIBILITY CONCLUSION***

In addition to the above factors, I note that plaintiff told Dr. Batchu that she had been diagnosed with migraines at the rate of one per week. There is no such diagnosis in the record before me. She told Dr. King that she had been diagnosed with degenerative disc disease. Again, there is no such diagnosis in the record. Plaintiff told a doctor she had tried physical therapy and it had not worked. The record establishes that plaintiff's doctor recommended physical therapy, but there is no evidence before me that she actually tried it. Although plaintiff testified that she had migraines once a week and that they last for three weeks (even after her explanation, I agree with the ALJ that this makes no sense), the medical record does not support a finding that plaintiff suffers from migraines other than maybe once in a great while.

28

She told a social worker that she had a history of migraines, so his assessment included history of migraines. She did not have a migraine or a complaint of migraine when she came in for treatment. More than a year later, she told the doctor at the Pottsville Hospital that she had previously taken Topomax for migraines. She had no complaint of migraines during that visit. Dr. Bronov indicated that the minor findings on plaintiff's brain MRI could be due to migraines, but he did not assess migraines. In April 2008, she reported that she had had one recent migraine for which she took Advil and that worked well. Dr. Griswold -- on the first time he saw plaintiff -- diagnosed migraines only because plaintiff told him she had a history of migraines. She was there to establish care and did not complain of a migraine. And finally, she told Dr. Batchu that she had been diagnosed with a history of migraines at the rate of one per week. However, the record establishes that plaintiff never went to the doctor because of a migraine. She only told doctors once in a while that she had a history of them.

Plaintiff told the ALJ that she had not taken any medication at all for her impairments for well over a year because her prescriptions ran out and she could not afford to get new ones. However, during the entire length of this case, plaintiff continued to smoke a pack of cigarettes a day, indicating that she can find the money to buy things she wants and that her symptoms must not be that bad or she would spend some of her cigarette money on medication.

The record clearly supports the ALJ's finding that plaintiff's allegations of disabling symptoms is not credible. Plaintiff argues, however, that the ALJ erred in the <u>manner</u> in which she reached this conclusion because she did not specifically discuss every <u>Polaski</u> factor. This argument is without merit. Neither case law nor agency policy requires such a ritualistic approach because not every factor will be relevant in every case. The Eighth Circuit has made very clear that an ALJ is not required to include a discussion of each <u>Polaski</u> factor. <u>Samons v.</u>

Apfel, 497 F.3d 813, 820 (8th Cir. 2007); Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). Rather, the appropriate inquiry is whether the ALJ properly looked at the evidence of record as a whole relevant to a claimant's individual claim. The ALJ in this case properly did so.

Plaintiff complains that the ALJ relied too heavily on the objective medical evidence in evaluating plaintiff's credibility, but the decision shows that the ALJ found plaintiff had a severe seizure impairment despite the fact that the medical basis for seizures was unclear and her MRI and EEG results were negative. Specifically, Dr. Felberg noted that it was unclear what plaintiff's spells represented and he characterized plaintiff's description of them as "a little peculiar." Dr. Batchu found that her initial seizures might have been related to Topamax withdrawal and Wellbutrin. And the doctors at Evanston Northwestern Hospital believed her seizures to be psychological.

Contrary to plaintiff's argument, the ALJ also properly considered the fact that plaintiff has not sought or received any medical treatment since May 2009. Although plaintiff claims that she has not sought treatment because of a lack of medical insurance, the record casts doubt on that assertion. The record shows that plaintiff sought extensive treatment in 2007 and 2008 for seizures and other conditions despite the fact that she did not have insurance during that time period either. She has not adequately explained what changed after May 2009 to prevent her from receiving additional medical care. Furthermore, Dr. King's treatment notes show that she would try to find out if plaintiff could qualify for "charitable funds" to obtain an MRI. Plaintiff apparently received those funds because she subsequently had the MRI. Yet the record fails to show that plaintiff tried to find any other sources of low cost or free medical care. The record also contains no evidence that plaintiff was ever denied treatment because she lacked insurance. Goff v. Barnhart, 421 F.3d at 793 ("[T]here is no evidence Goff was ever denied medical treatment due to financial reasons. Without such

30

evidence, Goff's failure to take pain medication is relevant to the credibility determination." citing Clark v. Shalala, 28 F.3d 828, 831 n. 4 (8th Cir. 1994)).

Therefore, it was appropriate for the ALJ to consider the fact that, at the time of the administrative hearing, plaintiff had not been to a doctor for almost two years and had not taken seizure medication for over a year prior to the administrative hearing in addition to not taking seizure medication for over a year and a half after her alleged onset date.

Also without merit is plaintiff's claim that the ALJ improperly considered the fact that no doctor has placed any restrictions on her ability to work. Her assertion that consideration of this fact circumvents the purpose of SSR 96-7p and Polaski is without merit. The Eighth Circuit has made clear that it is relevant that no doctor has restricted a claimant's activities. See Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) ("There is no indication in the treatment notes that either Dr. Freiman or any of Choate's other doctors restricted his activities, or advised him to avoid prolonged standing or sitting."); Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996).

The ALJ properly looked at other credibility factors as well. She discussed plaintiff's description of her daily activities and the questionnaire completed by her husband, she noted plaintiff's extensive daily activities.

Finally, the ALJ also determined that plaintiff had severe back problems even though the evidence showed only mild clinical findings and very conservative treatment recommendations. An MRI and x-rays showed only a "[m]inimal disc bulge" and "mild" degenerative changes. Dr. King's physical examinations showed some muscle spasm but no reproducible tenderness to palpation and a "fairly normal" range of motion. She prescribed medication but stated that regular exercise and general stretching exercises would make the biggest difference. A pattern of conservative treatment is a factor properly considered by the

31

ALJ in evaluating credibility.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001)(citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disabling symptoms is not credible.

## VII.    PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity because she did not explain in detail what medical and non-medical evidence she utilized to assess the RFC. This argument is without merit.  As discussed at length above, there are almost no abnormal findings in any of plaintiff's medical records.  Plaintiff complained of seizures; however, her treating doctors thought they were psychological, put her on no medications for years, put no functional limitations on her activities, and expressed disbelief at her alleged symptoms as they conflicted sharply with what the nurses and doctors observed when plaintiff was supposedly having a seizure.  Plaintiff's exams were consistently normal, x-rays and MRIs were consistently normal, mental status exams were consistently normal.  Plaintiff writes that, "It is not apparent what medical evidence the ALJ used to derive her RFC."  However, I note that it is not apparent what medical evidence plaintiff believes should have been used -- plaintiff does not state what medical evidence the ALJ should have considered but did not. Clearly this is because there are almost no abnormal medical findings anywhere in this record.

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

32

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 29, 2012

Case 2:11-cv-04315-REL   Document 16   Filed 10/29/12   Page 33 of 33